IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division

FILED
CHARLOTTE, NC

JUL 21 2021

US District Court
Western District of NC

---

JANICE GULLAS,
                      *Plaintiff,*

- against -

COMPREHAB, INC., doing business as
Compleat Rehab & Sports Therapy Center,
                      *Defendant.*

Docket No. 21-cv- 357

COMPLAINT
Trial by Jury

---

**PLAINTIFF** JANICE GULLAS, appearing *pro se*, brings this lawsuit against Comprehab, Inc. (hereinafter referred to as "Comprehab" or "Defendant") and seeks to recover damages for Defendant's violations of the Fair Labor Standards Act (hereinafter, "FLSA").

## PRELIMINARY STATEMENT

1. This matter is a straightforward wage and hour case premised on Defendant's willful violations of the FLSA. Plaintiff worked approximately 56 hours per week from May 14, 2018 through May 14, 2021. Defendant did not pay Plaintiff her regular hourly rate for all of her hours of work and the statutorily-required rate of one and one-half times the regular rate of pay for any and all hours that Plaintiff worked in excess of forty (40) hours each workweek.

## JURISDICTION AND VENUE

2. This Court has federal question jurisdiction over the FLSA claims pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

3. This Court has supplemental jurisdiction over the breach of contract claim under 28 U.S.C. §1367 because said claim arose from the same common nucleus of operative facts from which the FLSA claims arise.

4. This Court has personal jurisdiction over Defendant because it is doing business in North Carolina and in this district and because many of the acts complained of have occurred in this state and in this District and gave rise to the claims alleged.

5. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

6. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## THE PARTIES

7. Plaintiff Janice Gullas was, at all times relevant, an adult individual, residing in Huntington, West Virginia.

8. Plaintiff was employed by Defendant from March 28, 2018 through May 14, 2021 as a Physical Therapist.

9. Upon information and belief, Defendant Comprehab, Inc. is a North Carolina corporation, with its principal place of business at 2675 Court Drive, Gastonia, North Carolina 28054, within this District, and does business as Compleat Rehab & Sports Therapy Center.

10. Upon information and belief, Defendant had power over personnel decisions involving Plaintiff.

11. Upon information and belief, Defendant had power over payroll decisions over Plaintiff.

12. Upon information and belief, Defendant had the power to hire and fire Plaintiff, establish and pay her wages, set her work schedules and maintain her employment records, and acted with respect to the wage practices pertinent to Plaintiff.

2

13. At all relevant times, the work performed by Plaintiff was directly essential to the business operated by Defendant.

## STATEMENT OF FACTS

14. At all relevant times, Plaintiff is a citizen of the Republic of the Philippines and a resident of the state of West Virginia.

15. Plaintiff is a physical therapist by training or education, having graduated with a Bachelor's degree in Physical Therapy from an educational institution in the Philippines.

16. At all times relevant, Plaintiff was licensed to practice as a physical therapist in the states of West Virginia and North Carolina.

17. Plaintiff had more than five years of relevant experience working as a physical therapist in the Philippines.

18. At all relevant times, Plaintiff was employed by Defendant as a Physical Therapist, and was an employee within the meaning of 29 U.S.C. § 203(e)(1).

19. At all relevant times, Defendant was an employer within the meaning of 29 U.S.C. § 203(d).

20. At all relevant times, Plaintiff was an employee engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. §§ 206-207.

21. Plaintiff worked for Defendant as a home health care visiting Physical Therapist from July 2018 through July 2021, and was assigned in the state of West Virginia. As a home care physical therapist, Plaintiff was classified by Defendant as an exempt employee and received no overtime wages.

22. Defendant required Plaintiff to visit patients in their homes.

23. Beginning in July 2018, and from its North Carolina office, Defendant paid Plaintiff pursuant to an unlawful per visit/hourly basis hybrid compensation plan.

24. Defendant assigned a certain number of points (generally 1, 1.5 or 2) to each type of patient visit, using time estimates for patient visits to determine how many points to allocate.

25. Defendant compensated Plaintiff on an hourly rate basis for attending in-service education or training and conference time spent with the interdisciplinary health care team. Defendant did not pay Plaintiff for her travel time in-between patient visits and to the office from her patient visits. Most significantly, Defendant did not pay Plaintiff for the time she was required to spend "charting" – completing paperwork for each patient she visited.

26. To maintain and complete Defendant's required paperwork, Plaintiff routinely worked more than eight (8) hours a day and forty (40) hours per week. In addition to her normal forty (4) hour workweek spent traveling from one patient's home to the next, charting and coding in the office, Plaintiff spent an additional two (2) hours each weekday at home, and two to four hours each Saturday and each Sunday, documenting and charting the observation of a patient, physical therapy treatment provided, patient education, preparing exercise programs, and recertification based on an attending physician's orders.

27. Thus, Plaintiff worked approximately at least fifty six (56) hours per week, but was not compensated for her hours in excess of 40 per week.

28. Defendant misclassified Plaintiff and all other similarly situated home health care providers as exempt employees, despite the illegal hybrid compensation plan.

29. Given that Defendant misclassified Plaintiff as an "exempt" employee, Defendant failed to properly record all of her hours worked.

4

30. Accordingly, Defendant did not compensate Plaintiff for hours over forty (40) that she worked in a given workweek and did not pay a rate of one and one-half times her regular rate for these hours.

## FIRST CAUSE OF ACTION
### Fair Labor Standards Act (FLSA)

31. Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

32. Defendant has engaged in a widespread pattern and practice of violating the FLSA, as described in this Complaint.

33. At all relevant times, Plaintiff and other similarly situated current and former home care employees of Defendant were engaged in commerce and/or the production of goods for commerce, within the meaning of 29 U.S.C. §§206(a) and 207(a).

34. At all times relevant, Plaintiff engaged in "commerce" while working for the Defendant, as when she regularly used vehicle in driving to and from patient's homes, and as when she regularly used her laptop in documenting her patient visits, which vehicle and laptop were ordered and/or manufactured, upon information and belief, outside the state or delivered crossing state lines.

35. At all relevant times, Defendant had been and continues to be an employer engaged in interstate commerce and/or the production of goods for commerce, within the meaning of 29 U.S.C. §§206(a) and 207(a).

36. Upon information and belief, based on the nature of operations of Defendant, which included recruiting workers from foreign countries, transporting them to the United States, training them, employing them, and monitoring them, at all relevant times, Defendant employs or employed more than four (4) workers who fall under the category of "non-exempt employees"

pursuant to the FLSA, and these employees regularly and recurrently either engag commerce or handled or otherwise worked on goods or materials that had been moved in or produced for commerce, including computers and telephones, and such as when they handled credit card transactions or when they accepted delivery of supplies from out-of-state orders.

37. At all relevant times, Defendant was and continues to be an "enterprise engaged in commerce" because it utilized essential business equipment, such as computers, printers and office supplies that, upon information and belief, were manufactured outside the state of North Carolina and were moved in interstate commerce.

38. Upon information and belief, at all relevant times, Defendant regularly used, sourced out and ordered its computer equipment and supplies by ordering either through phone or online, with supply and distribution companies, and which various equipment and supplies, upon information and belief, were either manufactured outside the state of North Carolina or were delivered crossing state lines.

39. At all relevant times, Defendant's business activities are/were related, performed through unified operations or common control for a common business purpose, and constitute/constituted an enterprise within the meaning of 29 U.S.C. §§203(r).

40. At all relevant times herein, upon information and belief, Defendant's business and enterprise have/had annual gross revenues in excess of Five Hundred Thousand Dollars ($500,000.00).

41. The minimum and overtime wage provisions set forth in 29 U.S.C. §§201 *et seq.* apply to Defendant.

42. At all relevant times, Defendant had or has a policy and/or practice of refusing to pay regular minimum compensation for all worked hours, including overtime compensation for

6

those hours in excess of forty (40) hours per workweek, to its visiting home health care employees.

43. At all relevant times, Plaintiff was not employed in a *bona fide* executive, administrative, or a professional capacity pursuant to 29 U.S.C. § 213(a)(1) and corresponding regulations.

44. At all relevant times, Plaintiff was not subject to any other exemptions set forth in the FLSA or administrative regulations.

45. By misclassifying Plaintiff and similarly situated home health care providers as "exempt" employees, and thereby failing and refusing to pay them the regular hourly rate for all hours worked, as well as overtime wage compensation as required by law and in accordance with § 206 and § 207 of the FLSA, Defendant's violations of the FLSA, as described in this Complaint, have been willful and intentional. Defendant has failed to make a good faith effort to comply with the FLSA with respect to its compensation of Plaintiff and other similarly-situated current and former home care employees.

46. Because Defendant's violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. §255.

47. As a result of Defendant's willful failure to compensate its employees, including Plaintiff, for all of the hours actually worked by them, including those in excess of forty (40) hour per workweek, at their regular rate or overtime rate, the Defendant violated and continues to violate the FLSA, 29 U.S.C. §201 *et seq.*, including 29 U.S.C. §207(a)(1) and 215(a).

48. As a result of Defendant's failure to properly compensate its employees, including Plaintiff, the Defendant failed to make, keep, record, credit them with actual work hours, and to preserve records with respect to each of its employees, sufficient to determine the wages, hours

7

Case 3:21-cv-00357-FDW-DCK   Document 1   Filed 07/21/21   Page 7 of 19

and other conditions and practices of employment, in violation of the FLSA, 29 U.S.C. §201 *et seq.*, including 29 U.S.C. §211(c) and 215(a).

49. Due to Defendant's FLSA violations, Plaintiff suffered damages by being denied proper regular compensation for all her hours of work, including overtime pay for those hours in excess of 40 hours per workweek.

50. Due to Defendant's FLSA violations, Plaintiff is entitled to recover from the Defendant, the unpaid regular compensation for all her hours worked, including overtime compensation for those hours worked in excess of forty (40) hours per workweek, as well as additional amount equal to the unpaid compensation as and by way of liquidated damages, reasonable attorney's fees, and costs and disbursements of this action, pursuant to 29 U.S.C. §216(b).

## SECOND CAUSE OF ACTION
### Breach of Contract

51. Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

52. Upon information and belief, for the past several years, Defendant has recruited Filipino and Indian rehabilitation therapists to be sponsored by it and to work for it.

53. Upon information and belief, Defendant has required its foreign recruits to execute a standard Employment Agreement.

54. On or about February 24, 2012, Plaintiff and Defendant entered into an Employment and Noncompetition Agreement whereby Plaintiff promised to work for Defendant as a Physical Therapist and whereby Defendant promised to pay Plaintiff a monthly salary, with an annual salary range of at least $60,000.

8

55. On or about December 9, 2016, Plaintiff and Defendant amended their February 24, 2012 Agreement and agreed that the term of the contract was for five (5) years from the date the Employee (meaning, Plaintiff) would start rendering clinical work.

56. On or about September 5, 2017, Defendant filed its second-preference Form I-140 immigrant petition on behalf of Plaintiff for the position of Physical Therapist with the worksite address being in Gastonia, North Carolina.

57. On September 27, 2017, the EB-2 Form I-140 immigrant petition filed by Defendant on behalf of Plaintiff was approved by the U.S. Citizenship and Immigration Services.

58. Before Plaintiff was to go for her consular interview at the U.S. Embassy in Manila, Philippines, Defendant required Plaintiff to sign another Employment & Noncompetition Agreement on February 27, 2018.

59. The February 27, 2018 Agreement provided that it constituted the entire agreement between the parties and superseded all prior oral and written agreements between the parties with respect to the subject matter thereof.

60. The February 27, 2018 Agreement provided that the term of the contract was for three (3) years from the date that the Employee (meaning, Plaintiff) would start rendering clinical work.

61. The February 27, 2018 Agreement provided that the Employee (meaning, Plaintiff) would receive a bi-weekly salary for services rendered; that the annual salary range was at least $60,000; and; that Plaintiff's actual salary or compensation would be based on Department of Labor prevailing wage data for the specific location assigned to the Plaintiff.

62. On March 6, 2018, Plaintiff went for her U.S. visa interview at the U.S. Embassy in Manila, Philippines and presented a letter dated February 20, 2018 and signed by Defendant's

Case 3:21-cv-00357-FDW-DCK   Document 1   Filed 07/21/21   Page 9 of 19

9

President whereby Defendant confirmed its offer of employment to Plaintiff for the position of Physical Therapist on a full-time basis and whereby Defendant likewise confirmed that Plaintiff would be earning a salary of $73,195 per year, plus benefits.

63. Upon information and belief, the Department of Labor's prevailing wage rate for the position of an EB-2 Physical Therapist in Gastonia, North Carolina in early 2018 was $73,195 per year or $35.19 per hour.

64. The U.S. Embassy in Manila, Philippines issued Plaintiff her employment-based permanent visa to be able to enter and work in the United States.

65. On or about March 27, 2018, Plaintiff arrived in the United States from the Philippines.

66. Starting on March 28, 2018, Plaintiff, together with other newly-arrived recruits, presented herself to Defendant to start employment at Defendant's main office located in Gastonia, North Carolina, within this District.

67. From March 28, 2018 through May 11, 2018, Defendant provided orientation to Plaintiff regarding life in the United States, company policies and procedures, and generally on how to go about doing physical therapy paper works in various clinical settings.

68. Defendant paid Plaintiff only an allowance of $110 per week during the orientation period from March 28, 2018 through April 21, 2018.

69. Defendant paid Plaintiff the hourly rate of $35.19 for a guaranteed number of 35 hours per week each week from April 23, 2018 through June 29, 2018.

70. On or about May 11, 2018, Defendant deployed Plaintiff to work for one of its healthcare facility-clients in West Virginia as a visiting home care Physical Therapist.

71. Starting on May 14, 2018, Plaintiff rendered services as a home care Physical Therapist for Defendant's healthcare institution-client, Kindred at Home (hereinafter, "Kindred"), in Huntington, West Virginia.

72. Upon information and belief, the Department of Labor prevailing wage rate for the position of EB-2 Physical Therapist in the Huntington, West Virginia area for the period between May 14, 2018 and June 30, 2018 was $78,333 per year or $37.66 per hour.

73. Upon information and belief, the Department of Labor prevailing wage rate for the position of EB-2 Physical Therapist in the Huntington, West Virginia area for the period between July 1, 2018 and June 30, 2019 was $79,643 per year or $38.29 per hour.

74. Upon information and belief, the Department of Labor prevailing wage rate for the position of EB-2 Physical Therapist in the Huntington, West Virginia area for the period between July 1, 2019 and June 30, 2020 was $73,798 or $35.48 per hour.

75. Upon information and belief, the Department of Labor prevailing wage rate for the position of EB-2 Physical Therapist in the Huntington, West Virginia area for the period between July 1, 2020 and June 30, 2021 was $75,878 per year or $36.48 per hour.

76. On or about February 24, 2020, Plaintiff and Defendant amended their Employment Agreement whereby they agreed that in the event of any termination of the Employee (meaning, Plaintiff) as a result of branch/clinic closure, or decrease in available work that required a downsizing of staffing levels or other circumstances not in the Company's (meaning, Defendant's) control, termination was effective immediately and that Employer (Defendant) shall be under no further obligation to Employee (Plaintiff), except to pay accrued available PTO and unpaid base salary.

11

77. In the same February 24, 2020 Amendment, Plaintiff was given an opportunity to choose between two modes of compensation, which were either: (a) salary basis, with an annual salary of $74,293.13 or $47.62 per visit(sic); or (b) pay per visit basis, with a visit rate of $48.10 per visit.

78. In the same February 24, 2020 Amendment, Plaintiff chose "Salary Basis" as her compensation choice and accordingly countersigned her choice of compensation option to make the same expressly clear that she would like to be paid her current "salary" structure.

79. Plaintiff substantially performed under the Employment Agreement.

80. Defendant breached the Employment Agreement by failing to pay Plaintiff on a salary basis as provided for in the Employment Agreement.

81. As a home health care employee, Plaintiff often worked in excess of 8 hours in a day and 40 hours a week. Plaintiff would drive from her home to the homes of her assigned patients; would oftentimes drop by Kindred's office; would resume visiting other patients; and would drive back to her house at the end of the day.

82. In addition to working at least eight hours a day, Plaintiff would work on and/or finish her initial evaluation reports, re-evaluation reports, progress report notes and other communications to other members of the healthcare team, during night times, for at least two hours every night, and during week-ends, for at least two to four hours every week-end.

83. Beginning on or about July 1, 2018, and continuing, Defendant paid Plaintiff not on a salary basis, in violation of their employment agreement.

84. Defendant paid Plaintiff on an hourly basis, pursuant to a compensation plan whereby she was paid on an hourly rate based not on the actual number of hours worked and not on the Department of Labor prevailing wage rate, but based on a predetermined initial hourly

rate and based on an estimated number of hours supposedly required to finish a particular kind of homecare visit made.

85. Starting on or about July 1, 2018, Defendant paid Plaintiff an initial hourly rate of $46.92.

86. Starting on or about July 1, 2019, Defendant paid Plaintiff an hourly rate of $47.92.

87. Starting on or about July 1, 2018, Defendant computed and credited Plaintiff with his number of work hours by allocating a certain number of points corresponding to an arbitrarily estimated number of work hours supposedly required to do and finish a particular home care visit made by Plaintiff.

88. As and by way of an example, when Plaintiff did a start of care visit to a patient, she would normally take on average at least four and a half (4.5) hours to do the actual PT evaluation, drive to and from the patient's home, analyze, fill out and finalize documentation of the start of care evaluation.

89. In this example, if the initial evaluation were done in July 2018, Plaintiff would have been paid 4.5 hours multiplied by the prevailing wage rate of $38.29 per hour, or $172.30.

90. In this example, Defendant paid Plaintiff the hourly rate of $46.92 multiplied by the predetermined number of 2.5 points for the particular kind of visit made, which in this example was a start of care evaluation, or $117.30.

91. In this particular example, Defendant actually paid Plaintiff much less ($117.30) as compared to if it paid Plaintiff her actual number of work hours multiplied by the DOL prevailing wage rate ($172.30).

13

92. As and by way of a second example, when Plaintiff did a discharge visit to a patient, she would normally take on average at least two (2) hours to do the actual discharge visit, drive to and from the patient's home, analyze, fill out and finalize documentation of the discharge.

93. In this second example, if the discharge visit were done in July 2019, Plaintiff would have been paid 2 hours multiplied by the prevailing wage rate of $35.48 per hour, or $70.96.

94. In this second example, Defendant paid Plaintiff the hourly rate of $47.92 multiplied by the predetermined number of 1.25 points for the particular kind of visit made, which in this second example was discharge visit, or $59.90.

95. In this second example, Defendant actually paid Plaintiff much less ($59.90) as compared to if it paid Plaintiff her actual number of work hours multiplied by the DOL prevailing wage rate ($70.96).

96. As and by way of a third example, when Plaintiff did a PT evaluation visit to a patient (evaluation when nursing is involved in patient's care), she would normally take on average at least two hours and 45 minutes (2.75 hours) to do the actual PT evaluation visit, drive to and from the patient's home, analyze, fill out and finalize documentation of the PT evaluation.

97. In this third example, if the PT evaluation visit were done in July 2020, Plaintiff would have been paid 2.75 hours multiplied by the prevailing wage rate of $36.48 per hour, or $100.32.

98. In this third example, Defendant paid Plaintiff the hourly rate of $47.92 multiplied by the predetermined number of 1.75 points for the particular kind of visit made, which in this third example was PT evaluation visit, or $83.86.

99. In this third example, Defendant actually paid Plaintiff much less ($83.86) as compared to if it paid Plaintiff her actual number of work hours multiplied by the DOL prevailing wage rate ($100.32).

100. As stated above, Defendant paid Plaintiff her regular hourly rate for certain kinds of activities, such as attending interdisciplinary meeting or in-service seminars.

101. The Defendant's hybrid compensation plan was inconsistent with a salary basis of compensation or with a fee basis of compensation, and therefore, the Plaintiff should have been paid overtime wages for all hours she worked over 40 in a workweek.

102. Plaintiff often worked in excess of 8 hours in a day and 40 hours a week, yet the Defendant willfully failed to pay her overtime compensation of one and one-half times her regular rate of pay.

103. Defendant breached the Employment Agreement by failing to pay Plaintiff her compensation wage based on the Department of Labor prevailing wage rates at the place of Plaintiff's assignment (West Virginia).

104. Defendant breached the Employment Agreement by arbitrarily estimating Plaintiff's work hours, and by not paying her for all of her actual work hours.

105. Defendant breached the Employment Agreement by failing to pay Plaintiff her premium overtime pay for all of her hours of work in excess of forty (40) hours per work week.

106. Plaintiff suffered damages as a direct and proximate result of Defendant's breach of the Employment Agreement.

107. Plaintiff is entitled to compensatory damages for breach of contract in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### Action for Declaratory Judgment

108. Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

109. Plaintiff's first clinical assignment, after her orientation, started on May 14, 2018. She last worked for Defendant on May 14, 2021.

110. The parties' December 9, 2016 Amendment to the original Employment Agreement provided that the term of the contract was for five (5) from the date the Employee would start rendering clinical work.

111. The December 9, 2016 Amendment was superseded and replaced by the parties' February 27, 2018 Employment Agreement which clearly stated that the term of the contract was for three (3) years from the date that the Employee would start rendering clinical work.

112. On or about May 28, 2021, Defendant's lawyers sent a letter to Plaintiff reminding Plaintiff that the term of her employment with the Company (meaning, Defendant) was scheduled to expire on or about April 23, 2023.

113. Defendant's May 28, 2021 letter advised Plaintiff that her alleged voluntary termination of her employment before the end of the employment period would constitute a material breach of the contract, and that the Company would demand damages estimated to be $20,830.70.

114. Knowing that she had already fulfilled her three-year employment contract, Plaintiff did not respond to Defendant's May 28, 2021 letter.

115. On or about June 29, 2021, Defendant, through its lawyers, again sent Plaintiff another letter, this time informing Plaintiff that her employment was terminated effective May 17, 2021, and that as a result of Plaintiff's alleged breach of their employment agreement,

demanded that Plaintiff re-pay the Company $20,831.64 for its costs and lost revenue, within the next thirty (30) days.

116. The June 29, 2021 letter likewise warned Plaintiff that if she ignored the letter, "legal action may be filed against you without further notice".

117. Plaintiff has a definite and concrete dispute with Defendant concerning the "term" of their employment agreement, and concerning which between the December 9, 2016 Amendment and the February 27, 2018 Employment Agreement should be the controlling employment agreement between them.

118. Additionally, should the December 9, 2016 Amendment be considered the controlling employment agreement between the parties, there arises a definite and concrete dispute between the parties, as to whether or not the wage theft violations committed by Defendant which are subject matter of this case should be considered as "analogous" offenses provided for by the Employment Agreement as to be a ground for the immediate termination of the employment relationship by the Plaintiff.

119. The dispute touches the legal relations of parties having adverse legal interests.

120. The dispute is real and substantial.

121. The dispute admits of specific relief through a decree of a conclusive character.

122. The dispute involves a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

123. Defendant's threat to institute legal action would work to Plaintiff's detriment and injury, and for which she has no adequate remedy at law.

124. As a direct and proximate result of Defendant's threats to institute legal action and to unlawfully prolong or extend Plaintiff's employment, Plaintiff has suffered and will

17

Case 3:21-cv-00357-FDW-DCK   Document 1   Filed 07/21/21   Page 17 of 19

continue to suffer in the future, direct and consequential damages, including but not limited to, the loss of the ability to exercise her profession in an environment free of concerns or issues that would jeopardize her physical therapy license, her health, and the delivery of quality patient care to her patients.

125. By reason of the foregoing, an actual and justiciable controversy exists between Plaintiff and Defendant.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that this Court grant the following relief as against Defendant:

1. Payment of unpaid minimum and overtime wages, and an additional and equal amount as liquidated damages pursuant to the FLSA and the supporting United States Department of Labor Regulations;

2. Payment of pre-judgment and post-judgment interest;

3. An injunction requiring Defendant to pay all statutorily required wages and cease the unlawful activity described herein pursuant to the FLSA;

4. Payment of reasonable attorney's fees and costs of the action;

5. Alternatively, an Order requiring Defendant to pay Plaintiff the difference between the agreed-upon salary rate based on Department of Labor prevailing wage rates and the actual compensation paid to Plaintiff;

6. A declaratory judgment that the controlling Employment Agreement between the parties was the Agreement dated February 27, 2018, and that the term of the employment agreement was three years;

7. An order enjoining Defendant from enforcing or threatening to enforce a 5-year term of employment and from demanding damages from Plaintiff;

8. Such other relief as this Court shall deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a jury trial in this matter on all issues of fact raised by the Complaint.

Respectfully submitted.
July 19, 2021. Huntington, West Virginia.

> **JANICE GULLAS**
> 6621 Country Club Drive
> Huntington, WV 25705
> Tel. No. 704-691-9773
> Email: ptrpja@gmail.com
> *Pro Se Plaintiff*

### VERIFICATION

STATE OF WEST VIRGINIA  )
COUNTY OF  CABELL  ) S.S.

I, JANICE GULLAS, of legal age and a resident of the state of West Virginia, after having been sworn in accordance with law, hereby state that I am the plaintiff in the within Complaint. I have read the foregoing complaint and know the contents thereof. The contents are true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

JANICE GULLAS

SUBSCRIBED to before me on July 19, 2021.

Official Seal
Notary Public, State of West Virginia
Frank Lambertus II
3042 Mc Coy Rd.
Huntington, WV 25701
My commission expires March 12, 2022

STATE OF WEST VIRGINIA
COUNTY OF CABELL
Notary Public
The Foregoing Instrument was acknowledged before me this 19 day of July 2021
My commission expires 12 March 2022

Frank Lambertus II
Notary Public